Filed 2/13/26  L.S. v. B.C. CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| L.S.,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>B.C.,<br><br>    Defendant and Appellant. | F089949<br><br>(Super. Ct. No. VFL304319)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Tulare County.  Gary M. Johnson, Judge.

B.C., in pro. per., for Defendant and Appellant.

No appearance for Plaintiff and Respondent.

-ooOoo-

**INTRODUCTION**

Appellant B.C. appeals the trial court's grant of respondent L.S.'s request for a domestic violence restraining order (DVRO) under the Domestic Violence Prevention Act (Fam. Code, § 6200 et seq.) (DVPA).[1] Appellant alleges various procedural irregularities and errors violated his due process rights under the Fourteenth Amendment of the federal Constitution, and that the trial court's ruling was not supported by substantial evidence.

Appellant and respondent have one child together. After appellant and respondent ended their engagement and romantic relationship, appellant threatened respondent and continued to come to (and enter) respondent's house uninvited. On December 20, 2023, respondent sought a DVRO pursuant to the DVPA; a temporary restraining order (TRO) was issued the following day, pending adjudication of the DVRO request. After several continuances, and while disputes over custody and visitation were pending, the trial court held an evidentiary hearing on respondent's DVRO request in May 2025, and granted the DVRO, which appellant challenges on appeal.

For the reasons that follow, we conclude the trial court's factual findings and its order granting the DVRO are supported by substantial evidence, and that appellant has failed to establish the trial court prejudicially erred in any other regard. As such, we affirm.

**BACKGROUND**

I.    **Factual Background**

Appellant and respondent started dating in October 2018, and they began cohabitating in December 2018. The relationship ended when appellant moved out of respondent's house in December 2023; they never married, but they had been engaged to be married. According to respondent's testimony at the DVRO hearing, appellant had a

---

[1]    All statutory references are to the Family Code unless indicated otherwise.

2.

history of threatening her, threatening to burn down her house, smashing items in the house when they argued, grabbing her face forcefully, and stealing her property. In June 2023, respondent asked appellant to move out of her house, and by November 2023, he had gotten his own apartment, but he still had some of his things in respondent's house. On December 9, 2023, appellant entered respondent's house uninvited while she was working in the garage. He came up behind her, grabbed her around the waist, and said she needed to be careful because she could be raped. By December 13, 2023, she had made it very clear she did not want him to come to her house without letting her know. However, on December 14, 2023, appellant again entered her house without an invitation and without any notice to respondent. On December 19, 2023, he again came to her house without any invitation or prior notice; he sent respondent a text message while standing at her front door that he wanted to see the baby, and then he entered the house; respondent was out for a walk and she did not respond to the text. Feeling unsafe in her house, respondent sought a DVRO against appellant on December 20, 2023.

## II.     Procedural Background

A TRO was granted on December 21, 2023, and a hearing on the DVRO was set for January 10, 2024. Both parties appeared without counsel on January 10, 2024. The court's first available hearing date for the DVRO evidentiary hearing was June 6, 2024, and neither party objected to that date. The court also noted there was a hearing set on January 29, 2024, apparently related to custody and visitation matters.

On February 14, 2024, respondent filed a request for an order to show cause for contempt with a supporting affidavit (OSC re contempt). Respondent alleged appellant had violated the TRO by calling her on February 9, 2024.

### A.     February 22, 2024, Hearing

On February 22, 2024, the parties appeared for a regularly scheduled hearing. Appellant had counsel, but respondent did not. The court explained the hearing was on calendar for a review of reports regarding child custody and visitation. Since the hearing

3.

on January 29, 2024, the court indicated a mediation had been held, and a review of the report would be conducted at the hearing. Procedurally, the court noted there was a hearing set on March 21, 2024, on respondent's OSC re contempt for appellant's violation of the TRO; there was also a hearing set on June 6, 2024, on respondent's request for a DVRO.

The court explained the concerning allegations made in the DVRO petition might affect any child custody and visitation orders the court would issue, and that the court could not adequately address those issues without addressing the domestic violence allegations. The court found it was premature to adjudicate custody and visitation before the DVRO petition was decided. Respondent indicated she was "comfortable waiting until the June court date … to move forward." Appellant's counsel indicated his client understood why the court could not make long-term custody and visitation orders, and that they expected the custody and visitation matter would trail the DVRO hearing. Appellant's counsel indicated appellant was "willing to hedge his bets and start some of the counseling right now in terms of the coparent—or the parenting class, the batterer's program. He would like to get started on those. And by the time, you know, if the Court were to disagree with his explanation of things [with respect to the domestic violence allegations], then he's already got four or five months behind him. And if the Court does set it aside, then he can complete it or not."

Appellant's counsel asked the court to advance the arraignment on OSC re contempt matter so that appellant would not have to come to court again on March 21, 2024. They agreed to set the date on the contempt hearing for the same day as the trial on the DVRO. As a result, both the contempt and the DVRO hearings were set for June 6, 2024. The TRO was extended without objection.

Appellant's counsel then addressed professionally supervised visitation and explained that Chat House in Visalia was significantly backlogged for supervised visitation between appellant and his daughter. The court indicated Chat House was the

only court-authorized professional visitation provider. The court noted the mediator had recommended sole legal and physical custody be awarded to respondent, with appellant having supervised visitation at Chat House; the court ordered appellant to have professionally supervised visitation through Chat House with respondent having sole physical and legal custody. The court also indicated it would sign an order for appellant to begin a batterer's intervention, parenting and coparenting programs.

### B. June 6, 2024, Hearing

On June 6, 2024, both parties appeared and were represented by counsel. The court noted it was in receipt of the parties' exhibit and witness lists. Off the record, both parties had agreed the DVRO hearing would take more than three hours and, thus, the court would have to move the hearing to August 20, 2024. The court also noted a settlement conference date of August 8, 2024. The court indicated it was planning to deem the matter a long-cause trial and continue it to the department hearing the settlement conference.

In discussing the length of the hearing, appellant's counsel indicated Chat House had been unable to schedule visitation, and they were trying to negotiate with a third party for these visits because appellant had been completely excluded from his daughter's life. The court indicated there was nothing it could do about Chat House.

Appellant's counsel requested that the OSC re contempt proceeding be dismissed because the underlying conduct would be addressed in the DVRO hearing. Respondent, through counsel, agreed to dismiss her OSC re contempt request because it was somewhat redundant. The court dismissed the OSC re contempt proceeding without prejudice. Thus, the matters left were the DVRO and contested issues regarding child custody and visitation. The court extended the TRO until the next hearing date of August 20, 2024.

### C.    August 8, 2024, Hearing

On August 8, 2024, both parties appeared through counsel regarding settlement. The court indicated recent documentation showed appellant was about halfway through his batterer's intervention program. The parties noted they had tried to settle the custody and visitation issues, but were at an impasse regarding the DVRO. The parties went off the record to briefly meet and confer. When the court session resumed, appellant's counsel indicated appellant would complete his batterer's program by April, and made the following comments:

"And it would be my understanding if everything—if there is complete compliance, if the classes are completed that maybe they get re-referred to mediation to work out a more long-term plan, and then it would be reverted to a peaceful contact kind of stayaway arrangement at that time if everything is fine. One of [appellant's] concerns is that they do live in Kingsburg; not a big place. And his concern is, if there happens to be a point where he happens to pass her unbeknownst to herself that she's going to misinterpret that as some sort of willful violation. And that's probably what she's doing now. But it is a small town, and there has to be some kind of understanding between distinguishing a stalking type of situation as opposed to a—just a random 'he happens to be in the same area,' which I've advised him that if he does happen to see her unbeknownst that he is to turn around immediately and leave the area. So he understands that, but I think it needs to go both ways on how to interpret these incidental contact[s]."

The court explained it was incumbent on appellant to stay away from respondent, but if there happened to be incidental contact, not willful contact, then it is not a violation of the TRO. Respondent indicated she understood.

All parties agreed to continue the matter until April 22, 2025. The court indicated current orders were to remain in place.

### D. April 22, 2025, Hearing

Both parties appeared without counsel on April 22, 2025. Appellant submitted a proof of completion of his batterer's intervention program, and the court confirmed receipt. The court also confirmed respondent was still seeking the DVRO, and they set the matter for a contested hearing on the DVRO in advance of a move-away order respondent was seeking. Respondent also indicated she was planning to retain counsel, and the hearing on the DVRO was set for May 2, 2025.

### E. May 2, 2025, DVRO Hearing

Both parties appeared for the DVRO hearing on May 2, 2025; appellant appeared without counsel, and respondent appeared through counsel. Appellant's attorney noted he had been retained just that week, and he was uncertain if his office had filed a substitution of attorney form. The parties agreed the hearing was limited to the issue of the DVRO.

After testimony and evidence was received, the court granted a DVRO against appellant for a period of three years. Appellant appeals this May 2, 2025, order granting the DVRO.

### DISCUSSION

Appellant claims the trial court committed several prejudicial errors during the course of the DVRO proceedings, and he argues the court's order granting the DVRO is unsupported by substantial evidence.

As an initial matter, we note that respondent did not file a respondent's brief on appeal. Such a failure is not treated as a de facto default, however; rather, the reviewing court examines appellant's brief in conjunction with the record to determine if appellant carried his burden of demonstrating prejudicial error at the trial court level. (*In re Bryce C.* (1995) 12 Cal.4th 226, 232–233; *In re Marriage of Swain* (2018) 21 Cal.App.5th 830, 834, fn. 2; Cal. Rules of Court, rules 8.220(a)(2) & 8.360(c)(5)(B).)

As such, we turn to examine each of appellant's claims.

# I. Continuances of DVRO Hearing and Extending the TRO

Appellant claims the TRO was improperly extended for 16 months while the petition for a DVRO was pending. According to appellant, the continuances of the DVRO hearing were not supported by good cause and were granted without receipt of any live testimony.

## A. Legal Standards

Pursuant to the DVPA, a court may issue a protective order "'to restrain any person for the purpose of preventing a recurrence of domestic violence and ensuring a period of separation of the persons involved' upon 'reasonable proof of a past act or acts of abuse.'" (*Nevarez v. Tonna* (2014) 227 Cal.App.4th 774, 782, quoting former § 6300; see § 6220.) In relevant part, the DVPA defines domestic violence as abuse perpetrated against a cohabitant, former cohabitant, or a person with whom the respondent is having or has had a dating or engagement relationship. (§ 6211, subds. (b), (c).)

Under the DVPA, "'abuse'" means "(1) To intentionally or recklessly cause or attempt to cause bodily injury[;] [¶] … [¶] (3) To place a person in reasonable apprehension of imminent serious bodily injury to that person or to another[; or] [¶] (4) To engage in any behavior that has been or could be enjoined pursuant to Section 6320." (§ 6203, subd. (a).) Section 6320 includes "attacking, … threatening, … harassing, … destroying personal property, … contacting, … coming within a specified distance of, or disturbing the peace of the other party .…" (*Id.*, subd. (a).) Disturbing the peace of the other party "refers to conduct that, based on the totality of the circumstances, destroys the mental or emotional calm of the other party." (*Id.*, subd. (c).) To issue a protective order under the DVPA, past abuse must be shown by a preponderance of the evidence. (*In re Marriage of Davila & Mejia* (2018) 29 Cal.App.5th 220, 226.) Past acts of abuse do not have to occur before the petitioner files the request, nor does it bar the court from considering any abuse occurring after the petition is filed. (*In re Marriage of F.M. & M.M.* (2021) 65 Cal.App.5th 106, 116.)

The DVPA also authorizes ex parte TRO's pending a hearing. (§§ 6320–6327.) A TRO must be issued or denied on the same day as the application is submitted to the court, unless the application is filed too late in the day to permit effective review, in which case it must be issued or denied the next court day. (§ 6326.) The procedure for obtaining an ex parte TRO is set forth in section 240 et seq. Under section 242, when an application for a TRO is granted, the order must include an order to show cause why a permanent restraining order should not be granted and set a hearing date within 21 days or, with good cause, within 25 days. "If a hearing is not held within the time provided [under section 242, subdivision (a)], the court may nonetheless hear the matter, but the temporary restraining order shall no longer be enforceable unless it is extended under Section 245." (*Id.*, subd. (b).)

Under section 245, subdivision (b), "Either party may request a continuance of the hearing, which the court shall grant on a showing of good cause. The request may be made in writing before or at the hearing or orally at the hearing. The court may also grant a continuance on its own motion." As the statute uses "may" language to permit continuances on the court's own motion, we conclude the decision to do so is committed to the trial court's discretion, and it is reviewed on appeal under the abuse of discretion standard. (See *In re Marriage of Falcone & Fyke* (2008) 164 Cal.App.4th 814, 822–823.)

**B.     Analysis**

Respondent's petition for a DVRO was filed on December 20, 2023; a hearing on the DVRO was set and a TRO was issued.[2] The DVRO hearing was continued multiple times on the court's own motion without objection, and the court extended the TRO each time, until the DVRO petition was heard on May 2, 2025.

---

[2]     Neither the DVRO petition nor the TRO are included in the record on appeal, but the filing of the petition and issuance of the TRO are noted in the trial court's register of actions included in the official clerk's transcript.

As an initial matter, appellant's claim the court improperly continued the DVRO hearing is forfeited. "[A] reviewing court ordinarily will not consider a challenge to a ruling if an objection could have been but was not made in the trial court. [Citation.] The purpose of this rule is to encourage parties to bring errors to the attention of the trial court, so that they may be corrected." (*In re S.B.* (2004) 32 Cal.4th 1287, 1293, fn. omitted.) Indeed, "[a]s the United States Supreme Court recognized in *United States v. Olano* [(1993)] 507 U.S. [725,] 731, '"[n]o procedural principle is more familiar to this Court than that a constitutional right," or a right of any other sort, "may be forfeited in criminal as well as civil cases by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine it."'" (*In re Sheena K.* (2007) 40 Cal.4th 875, 880–881.) While the rule is subject to some exceptions, the appellate court's discretion to excuse forfeiture should be exercised rarely and only in cases presenting an important legal issue. (*Id.* at pp. 887–888 & fn. 7.)

The parties did not object to the continuances, and appellant's claim the trial court erred in doing so is forfeited. But even considering the merits, the trial court was entitled to continue the hearing on a requested DVRO on its own motion (§ 245, subd. (b)), and to extend the TRO (*id.*, subd. (c)). Appellant argues the trial court never articulated any good cause for extending the hearings, but the record reflects there was good cause.

The initial hearing set in January 2024 was continued to June 2024 because the assigned trial judge was not available until that time for a long-cause trial—neither party objected. The parties indicated to the trial court in June 2024 that the hearing would likely last more than three hours, and they agreed to continue the matter until August 2024 for an available time on the court's docket. In August 2024, the parties again agreed to a continuance until April 2025 when it was anticipated appellant would complete his batterer's intervention program, and there might be a prospect of settlement. In April 2025, respondent indicated she still wished to move forward with her DVRO request and, without objection, the parties proceeded to a long-cause trial on May 2,

2025. The record reflects a good-cause basis to continue the hearing. Moreover, when the court granted the continuance of the DVRO hearing, statutorily the TRO was to remain in effect until the end of the continued hearing, unless otherwise ordered—no new findings were required to continue the TRO. (§§ 245, subd. (c), 6327.)

Relying on *Elkins v. Superior Court* (2007) 41 Cal.4th 1337, appellant argues the trial court erred by extending the TRO without receiving any oral testimony. This argument misapprehends *Elkins*. There, a local rule in the superior court required parties to present their case by means of written declarations in dissolution trials. (*Id.* at p. 1344.) Our high court struck down the local rule, explaining the practice and procedure applicable to civil actions generally apply to family law proceedings. The rule called for the admission of declarations in lieu of live testimony, but the declarations constituted hearsay and were inadmissible. (*Id.* at p. 1354.) The court observed the practice of permitting oral testimony was also "consistent with the historically and statutorily accepted practice of conducting trial by means of the oral testimony of witnesses given in the presence of the trier of fact." (*Id.* at p. 1357.)

Different from *Elkins*, a TRO may be granted based solely on an affidavit—no live testimony is required. (§ 6300, subd. (a).) Additionally, there is also no requirement that the trial court receive live testimony to grant a continuance of the DVRO hearing and extend a TRO under section 245, subdivisions (b) and (c). When respondent's DVRO petition was heard in May 2025, live testimony was received pursuant to section 217, subdivision (a). (See *In re Marriage of D.S. & A.S.* (2023) 87 Cal.App.5th 926, 934 ["DVPA hearings are subject to section 217"].) We find no basis to conclude the trial court erred in continuing the hearing on respondent's DVRO petition under section 245, subdivision (b), and extending the TRO pursuant to section 245, subdivision (c).

## II. Unavailability of Supervised Visits During Pendency of TRO

Appellant next argues that by ordering visitation only through Chat House, knowing it was backlogged, and refusing to modify the temporary orders for a different

provider, the court deprived appellant of visitation with his child, contrary to section 3020, subdivision (b), which favors "'frequent and continuing contact with both parents.'" As a result, appellant argues, he lost eight months of contact with his daughter. By restricting visitation to a professional center that could not accommodate any visits, appellant argues the trial court created "impossible conditions," and deprived appellant of contact with his daughter for months. This resulted in a violation of appellant's due process rights, contravened statutory policy, and prejudiced appellant in the DVRO proceedings because it gave the impression he was not involved in his daughter's life.

## A. Additional Background

In issuing a temporary visitation order on February 22, 2024, the court ordered that respondent be permitted, at his cost, professionally supervised visits with his daughter through Chat House in Visalia. Each party was ordered to contact Chat House within five (5) days of the order.

At the February 22, 2024, hearing, appellant's counsel raised the issue of backlog with supervised visits at Chat House. Counsel noted there might be availability at a supervised visitation center in Fresno, which was appellant's preference "because it's been so long since he's seen his child .…" The court shared counsel's concerns, but concluded "the only authorized professional visitation provider, at least from the perspective of the Tulare County Superior Court" was Chat House. Counsel responded, "then I guess we are stuck."

At the June 6, 2024, hearing, appellant's counsel again noted Chat House was still unable to accommodate any visitation, and it had been six months since supervised visits were ordered. Although counsel had proposed alternatives in February 2024, counsel indicated it understood "the Court can't order anything beyond what [it had] already ordered. So we are trying to negotiate a third party to get these visits at least started because right now he's completely excluded from this child's life." Respondent's

12.

counsel indicated they had been on the waitlist at Chat House, but respondent would not agree to visitation that was not professionally supervised.

The court explained as follows: "I don't want to start delving into issues related to custody and visitation. I—there are temporary orders in place. [¶] I understand, [appellant's counsel], your client, I'm sure, is very anxious to see [his daughter], but it is, unfortunately, just given the circumstances and the allegations which are quite serious, the Court, back in February, made the order that the parties sign up immediately for Chat House. Now, sounds like they are on the waitlist. And, hopefully, those Chat House visits will begin soon. It is unfortunate—very unfortunate that Chat House does have such a long waitlist, but that is simply the reality of the situation. So the Court is not going to be making any alterations or changes to the temporary orders that are currently in place .…"

### B. Analysis

In section 3020, subdivision (b), the Legislature found and declared "that it is the public policy of this state to ensure that children have frequent and continuing contact with both parents after the parents have separated or dissolved their marriage, or ended their relationship, and to encourage parents to share the rights and responsibilities of child rearing … except when the contact would not be in the best interests of the child, as provided in subdivisions (a) and (c) of this section and Section 3011."

Pursuant to section 3100, subdivision (b)(1)(A). "If a protective order, …, has been issued restraining a parent, the court shall consider whether the best interest of the child requires that visitation by that parent be suspended, denied, or limited to situations in which a third person, specified by the court, is present, including virtual visitation."[3]

---

[3] A protective order under the statute includes restraining orders, whether issued ex parte, after notice and hearing, or in a judgment issued under section 6320 enjoining specific acts of abuse. (§ 6218.)

First, although appellant's counsel voiced concerns over the visitation delays, he made no due process claims or a statutory claim in the trial court—indeed, counsel conceded the trial court's hands were tied if visitation through Chat House was delayed. (*D.Z. v. L.B.* (2022) 79 Cal.App.5th 625, 632 ["California courts recognize that claims alleging violations of due process rights can be forfeited by failing to raise them in the trial court."].)  The purpose of the forfeiture doctrine is to encourage a party to bring any errors or deficits in the proceedings to the attention of the trial court so that they may be corrected or avoided.  (*People v. Saunders* (1993) 5 Cal.4th 580, 590.)  Any due process or statutory claims raised on appeal regarding delays in scheduling professionally supervised visitation have been forfeited by failing to make a specific objection on these grounds below.  (*In re Marriage of Moore* (2024) 102 Cal.App.5th 1275, 1289 ["The failure to raise an issue in the trial court forfeits the claim of error on appeal."].)

Moreover, the trial court determined only *professionally* supervised visits were in the child's best interests given the allegations of domestic violence.  The trial court was not required, given its obligation to determine the bests interests of the *child*, to select a provider recommended by appellant.  (§ 3100, subd. (b)(1)(B), (C).)  While the delays in scheduling visitation were lengthy and concerning, because professionally supervised visits were deemed the only appropriate visitation method given the best interests of the child, we are unable to conclude the court was required to order a different method of supervision or with a professional provider not authorized by the court.

## III.    DVRO Hearing Procedures

Appellant contends his right to due process was violated and meaningful appellate review was frustrated when a 21-minute break in the DVRO hearing occurred on May 2, 2025, while respondent's counsel attempted to connect video evidence to play over courtroom technology.  The reporter's transcript and a minute order note there was an unreported break in the proceedings while counsel resolved technical difficulties getting connected to the video.  Appellant contends there may have been things said about the

contents of the video, and there is an issue whether any third party handled the device that played the video. In asserting other contradictions in the record undermine confidence in its reliability, appellant points to additional instances of purported inconsistency: (1) two minute orders that indicate there was no court reporter available, but there are reporter's transcripts for both days (April 22, 2025, and May 2, 2025); and (2) an off-the-record discussion with counsel at the June 6, 2024, hearing.

First, the notations on the court's minute orders for April 22, 2025, and May 2, 2025, are preprinted check boxes that are checked only when no court reporter is available—these boxes were *not* checked on either minute order indicating a court reporter *was* available for the proceedings; and, notably, the hearings were reported. There is no inconsistency in the record in this regard.

Second, the June 6, 2024, hearing involved an off-the-record conversation between counsel and the court about the length of the DVRO hearing. The court explained, on the record, both counsel felt that the hearing would exceed three hours. Neither attorney noted any inaccuracy in the trial court's summary of their off-the-record conversation. While the conversation was unreported, the court summarized their discussion on the record, which adequately captured why the hearing was continued to a date and time when the court could accommodate a long-cause hearing.

Turning to the break in the proceedings at the May 2, 2025, DVRO hearing, the record reflects respondent's counsel attempted to connect a video to the trial court's audio/visual system, and there was a 21-minute break in the proceedings to deal with this technical issue. The need to manage audio/visual equipment was not part of the judicial proceedings. Counsel's conversation with the deputy about the audio/visual issue was not part of the proceedings nor was it presented to the court as evidence in the case; thus, the fact there was no record of what counsel discussed with the deputy is irrelevant.

Appellant's reliance on *Cardona v. Soto* (2024) 105 Cal.App.5th 141 is misplaced. There, the trial court improperly obtained unreported testimony from a minor pertinent to

the court's ruling on a DVRO that was not summarized for the record, thereby precluding the father from any meaningful opportunity to respond to the minor's testimony. (*Id.* at p. 149.) The appellate court explained that in a contested restraining order hearing, the trial court is tasked with protecting the fundamental due process rights of the parties. Although the trial court's interview of the parties' daughter outside their presence was meant to protect the child, failing to "have the interview reported or to otherwise inform [the father] of the substance of what daughter said 'fundamentally deprived him of the ability to rebut or explain [the] evidence the trial court considered and relied upon' in issuing the DVRO." (*Id.* at p. 151.)

Here, appellant fails to explain how the unreported break in the proceedings had any effect on the trial court's consideration of the evidence or the issues in the case. Appellant merely speculates about what might have been said, if anything, between counsel and the deputy, or by the court, or that a third party may have handled respondent's audio/visual exhibit. Such speculation is insufficient to show a due process violation, especially when there is no connection between the purported actions that were unreported and the trial court's substantive consideration of the issues. (*Parris J. v. Christopher U.* (2023) 96 Cal.App.5th 108, 134 [burden is on the appellant to show prejudicial error that resulted in a miscarriage of justice].)

## IV. Settlement "Pathway"

Appellant claims that at the August 8, 2024, hearing, the court placed the parties on "a clear framework" toward settlement. According to appellant, the terms of that pathway included appellant finishing a 52-week batterer's intervention program. If appellant finished the program, then the matter would be reviewed on April 22, 2025. Appellant understood that if he was compliant with that requirement, then the matter would be referred to mediation to create a long-term parenting plan, and the orders could transition to peaceful contact rather than prohibiting contact altogether. Although appellant fully complied by completing the batterer's program, which the trial court

16.

acknowledged, as well as parenting and coparenting classes, instead of referring the matter to mediation, the court placed the DVRO on calendar for trial on May 2, 2025. Appellant argues abandonment of this plan was an abuse of discretion.

In February 2024, the parties agreed that the DVRO issue would affect pending custody and visitation issues, and agreed the DVRO petition should be heard first. Appellant's counsel noted that appellant wanted to "start some counseling right now in terms of the coparent[ing and a] batterer's [intervention] program" to "hedge his bets" regarding custody and visitation issues upon resolution of the DVRO.

At the August 8, 2024, hearing, both parties were represented by counsel. Through counsel, the parties represented that, although they had worked on a settlement of the outstanding issues, they were at "an impasse." Respondent's counsel explained the sticking point was a restraining order that would remain in place. The parties and the court then agreed to talk off the record about a potential settlement. When they resumed on the record, the following exchange occurred:

> "[RESPONDENT'S COUNSEL]: Okay, Your Honor, I believe we have an agreement.
>
> "THE COURT: All right. Let's go ahead and go on the record in the [L.S. v. B.C.], please.
>
> "[APPELLANT'S COUNSEL]: Eric Hamilton for [appellant] again. So we've met and conferred, Your Honor, and I think we have an understanding that [appellant] will be completely done with the [batterer's intervention] class at least by April. He's about four—four months in right now. And so we're looking at April 22nd as a review-type hearing, and it's my understanding—
>
> "THE COURT: And setting if we need it.
>
> "[APPELLANT'S COUNSEL]: Right. And it would be my understanding if everything—if there is complete compliance, if the classes are completed that maybe they get re-referred to mediation to work out a more long-term plan, and then it would be reverted to a peaceful contact kind of stayaway arrangement at that time if everything is fine. One of

17.

[appellant's] concerns is that they do live in Kingsburg; not a big place. And his concern is, if there happens to be a point where he happens to pass her unbeknownst to herself that she's going to misinterpret that as some sort of willful violation. And that's probably what she's doing now. But it is a small town, and there has to be some kind of understanding between distinguishing a stalking type of situation as opposed to a—just a random 'he happens to be in the same area,' which I've advised him that if he does happen to see her unbeknownst that he is to turn around immediately and leave the area. So he understands that, but I think it needs to go both ways on how to interpret these incidental contact[s].

"THE COURT: Well, I think both of you need to understand that if it's incidental contact, it's not a violation, correct?

"[APPELLANT'S COUNSEL]: It has to be willful.

"[RESPONDENT'S COUNSEL]: And I disagree with [appellant's counsel] that that's what my client is doing now.

"THE COURT: I'm not saying it is.

"[RESPONDENT'S COUNSEL]: I agree with you. There is incidental contact with people where you see each other and go the other way. There is a difference.

"THE COURT: It's incumbent on you, sir, to stay away. But if he happens to just be there and he's not purposefully doing it then it's not a violation. Okay?

"[RESPONDENT'S COUNSEL]: She understands.

"THE COURT: Yeah.

"[RESPONDENT'S COUNSEL]: Completely.

"THE COURT: All right. So we're going to put it out to April 22, 2025 at 8:30. Current orders remain. I'm ordering Chat House if it hasn't already been ordered."

The court then reminded appellant not to violate the TRO, and explained to appellant he could not own or possess firearms, ammunition, reloaded ammunition, or body armor, and the hearing concluded.

18.

On April 22, 2025, the parties again appeared, but this time neither were represented by counsel. The court noted appellant had completed his batterer's intervention program, but respondent stated she was still pursuing the DVRO. The court set a date for the trial on the DVRO. Appellant did not object or question the court's setting of the contested hearing.

No settlement was formally placed on the record in August 2024, nor does the record reflect an indication respondent would definitively dismiss her DVRO petition if appellant completed a batterer's intervention program. Indeed, that was part of the "impasse" in settlement that respondent's counsel noted at the outset. Barring an enforceable agreement of some type, neither the court nor appellant could force respondent to dismiss her DVRO petition request simply because appellant completed the batterer's intervention program, which he had undertaken to "hedge his bets" with regard to visitation and custody issues. There was no abuse of discretion in the trial court's purported failure to enforce a "settlement pathway" outlined at the August 2024 hearing.

## V. The Dismissed Contempt Proceeding

Appellant argues that because the contempt proceeding was dismissed, the underlying conduct alleged to have constituted the violation of the TRO could not be considered at the DVRO hearing.

In February 2024, respondent filed an affidavit alleging appellant had violated the TRO by attempting to call her on February 9, 2024. At the June 2024 hearing, appellant's counsel indicated he was "hoping" respondent would dismiss her contempt allegation as it was "going to be part of the [DVRO]" matter. Respondent's counsel agreed the alleged violation of the TRO was going to be at issue with respect to the DVRO, so it was redundant to raise the conduct in two separate proceedings, and respondent was willing to dismiss it without prejudice. The court granted the request.

At the DVRO hearing in May 2025, the February 9, 2024, call was offered as abusive conduct supporting the DVRO request. Appellant testified he had maintained

19.

full compliance with the TRO, which he reiterated in his closing comments. In ruling on the DVRO petition, the court found appellant had not "been in compliance th[is] whole time." The court concluded appellant had made the phone call to respondent in violation of the TRO, which appellant had failed to address. On appeal, appellant argues it was improper to "revive[]" the contempt allegation during the DVRO hearing, and for the court to consider it for purposes of granting the DVRO. We are not persuaded.

The phone call appellant made to respondent in February 2024 was relevant to the DVRO proceedings, separate and apart from the dismissed allegation that this conduct constituted contempt of the TRO. Under the DVPA, the trial court considers the totality of the circumstances in deciding whether to grant a DVRO, which includes all relevant conduct both before and after the DVRO petition has been filed. (§ 6301, subd. (d) ["The court shall consider the totality of the circumstances in determining whether to grant or deny a petition for relief."]; *In re Marriage of F.M. & M.M., supra*, 65 Cal.App.5th at p. 117 ["Postfiling abusive conduct is clearly relevant in cases in which a TRO has been granted pending a hearing on a permanent restraining order."].) Appellant's attempt to contact respondent after specifically being ordered *not* to do so was relevant to whether appellant was engaging in abusive behavior. (§ 6320, subd. (c).)

Moreover, the phone call was also relevant to appellant's credibility. The court commented in ruling on respondent's petition that it did not believe appellant had complied with the TRO the "whole time" because he had made the phone call on February 9, 2024.

We find no error in the court's consideration of this conduct, especially because it was relevant to assess the totality of the circumstances and appellant's credibility. Moreover, the parties expressly contemplated this conduct would be considered as part of the DVRO request—this was the reason respondent decided to dismiss the contempt proceeding. Appellant has not carried his burden of establishing prejudicial error on the

part of the trial court.  (*Parris J. v. Christopher U., supra*, 96 Cal.App.5th at p. 134 [the appellant's burden on appeal to show claimed error is prejudicial].)

## VI.    Substitution of Counsel

Respondent was represented by counsel at the May 2, 2025, hearing.  Appellant asserts respondent failed to give him adequate notice of her decision to retain an attorney after having appeared in pro. per. at the last hearing, and she failed to file any substitution of attorney form with the court.  Appellant asserts the court's acceptance of this unauthorized representation at the May 2025 hearing prejudiced him by depriving him of an opportunity to seek a continuance or prepare for arguments from a professional attorney; and it "shifted the balance of advocacy without statutory notice."  Appellant also maintains that allowing unauthorized counsel to appear undermined his due process rights by blindsiding appellant and prejudicing his defense.

Code of Civil Procedure section 284 provides as follows:  "The attorney in an action or special proceeding may be changed at any time before or after judgment of final determination .…  [¶]  1. Upon the consent of both client and attorney, filed with the clerk, or entered upon the minutes;  [¶]  2. Upon the order of the court, upon the application of either client or attorney, after notice from one to the other."

Code of Civil Procedure section 285 provides, "When an attorney is changed, as provided in [section 284], written notice of the change and of the substitution of a new attorney, or of the appearance of the party in person, must be given to the adverse party.  Until then he must recognize the former attorney."  The notice must be served on the adverse party within the time limitations specified by the statute governing service of a written notice of a motion.  (7 Cal.Jur.3d (2025) Attorneys at Law, § 234; Code Civ. Proc., § 1005, subd. (a)(13).)  The notice required under section 285 is "for the protection of the adverse party and may be waived by him."  (*Anderson v. City Ry. Co.* (1935) 9 Cal.App.2d 205, 207.)

Based on the register of actions contained in the record, no substitution of counsel form was filed with the court, and there is no evidence appellant was given notice of the substitution prior to the May 2025 hearing. However, respondent had noted at the hearing in April 2025 that she intended to seek counsel for purposes of the DVRO. When respondent's counsel appeared and indicated he was representing respondent, the court had before it adequate evidence to determine that respondent had accepted the representation of counsel, and that her counsel was authorized to act on her behalf. (See *Alliance Bank v. Murray* (1984) 161 Cal.App.3d 1, 7, fn. 1.) With respect to respondent's failure to afford appellant adequate notice of the substitution, appellant did not object to the substitution or seek a continuance based on the changes in representation. Moreover, appellant does not explain what additional preparation was required given the unexpected presence of counsel or how it affected his defense, especially since appellant had actual notice in April 2025 that respondent intended to retain counsel for the hearing in May 2025.

## VII. The Trial Court's Ruling on the DVRO

### A. Evidentiary Issues

Appellant argues respondent's exhibits were admitted at the June 2024 hearing without sufficient foundation and over appellant's objection. In contrast, appellant maintains, his attempt to present rebuttal evidence was curtailed and his evidence excluded. Appellant argues such "asymmetry" violates his due process right.

#### 1. Respondent's Admitted Evidence

Respondent's exhibit No. 1 included screenshots of a video respondent testified show appellant entering her house on December 19, 2023. Respondent testified the final screenshot in this exhibit showed appellant entering the passcode to her door to unlock it.

Respondent testified exhibit No. 2 depicted appellant arriving at respondent's house later in the day on December 19, 2023, walking up her driveway holding coffee, and then standing at the door to respondent's house.

Respondent testified exhibit No. 3 was a screenshot of her phone showing appellant had attempted to call her on February 9, 2024.

### 2.     Appellant's Evidence

Appellant offered two text messages he sent to respondent on December 19, 2023. Respondent read both messages into the record and answered questions about them—this evidence was not excluded.

Appellant next offered a letter from a third party who "had a conversation with [appellant and respondent] on December 18[, 2023,] and wrote a witness testament to it." Respondent objected to the document as hearsay, which the court sustained.

### 3.     Analysis

A party proffering photographs as evidence must authenticate that evidence. (*People v. Calhoun* (2019) 38 Cal.App.5th 275, 313–315.)  "Authentication of a writing means (a) the introduction of evidence sufficient to sustain a finding that it is the writing that the proponent of the evidence claims it is or (b) the establishment of such facts by any other means provided by law." (Evid. Code, § 1400.)  A photograph qualifies as a writing.  (*Id.*, §§ 100, 250.)

"A photograph or video recording is typically authenticated by showing it is a fair and accurate representation of the scene depicted." (*People v. Goldsmith* (2014) 59 Cal.4th 258, 267 (*Goldsmith*).)  "This foundation may, but need not be, supplied by the person taking the photograph or by a person who witnessed the event being recorded. [Citations.]  It may be supplied by other witness testimony, circumstantial evidence, content and location." (*Id.* at p. 268.)  All that is required for admissibility "is a prima facie case.  'As long as the evidence would support a finding of authenticity, the writing is admissible.  The fact conflicting inferences can be drawn regarding authenticity goes to the document's weight as evidence, not its admissibility.'" (*Id.* at p. 267.)

Additionally, Evidence Code section 1553 supplies a means to authenticate printed images.  (*Goldsmith, supra*, 59 Cal.4th at p. 268.)  Under this statute, a "printed

23.

representation of images stored on a video or digital medium is presumed to be an accurate representation of the images it purports to represent." (Evid. Code, § 1553, subd. (a).) The presumption operates "to establish, at least preliminarily, that errors in content have not been introduced in the course of printing the images and accompanying data." (*Goldsmith, supra*, at p. 269.) If a party offers evidence that the printed image "is inaccurate or unreliable," then "the party introducing the printed representation into evidence has the burden of proving, by a preponderance of evidence, that the printed representation is an accurate representation of the existence and content of the images that it purports to represent." (Evid. Code, § 1553, subd. (a).) In the absence of contrary evidence, the presumption supports a finding the printed versions of images are accurate representations of the images and data stored on a device. (*Goldsmith, supra*, at p. 269.)

Under Evidence Code section 1553, respondent's printouts of the screenshots from her Ring camera were presumptively accurate representations of the images stored on respondent's Ring camera device. Respondent introduced no contrary evidence. An adequate foundation was laid for the authenticity of the video screenshots, and the trial court did not error in admitting them.

Turning to appellant's evidence, it was largely admitted, including text messages and photographs. The only evidence appellant identifies that was ruled inadmissible was an out-of-court statement written by a third party.[4] Offered for the proof of its content, the written document was hearsay (Evid. Code, § 1200), and without an applicable hearsay exception, it was inadmissible. Rather than opting to offer a letter from a third party, appellant could have listed the third party as a witness and called that person at trial, but there is no evidence appellant took those steps; the court did not deprive

---

[4] Appellant claims he attempted to introduce documentation of compliance with his batterer's intervention program, parent, and coparenting programs was excluded because these documents were not premarked as exhibits. The record transcript citation appellant provides does not show these exhibits were offered or excluded. In addition, the court acknowledged proof of completion of the batterer's intervention program at the April 2025 hearing.

appellant the opportunity to do so.  Nothing in the record reflects the court erred in making any evidentiary rulings, or that it failed to apply the rules of evidence consistently and fairly.

**B.      Substantial Evidence Supports the Trial Court's Ruling on the DVRO**

Appellant contends there is no substantial evidence to support the court's decision to grant the DVRO.  Appellant argues respondent's testimony about his conduct was not corroborated by other evidence such as photographs, police reports, or percipient witnesses; the February 2024 missed-call evidence stemmed from a dismissed contempt allegation and should not have been considered; and his entry into respondent's house in December 2023 did not amount to illegal entry because he had the code to the door and it was an accepted practice between them.  Moreover, even if respondent's testimony was credible, it does not establish abuse as defined in section 6203.

**1.      Additional Background**

The trial court made findings and provided the following rationale for granting respondent's DVRO petition:

> "All right.  I don't think you've been in compliance the whole time. I think you made a phone call in violation of the temporary order that was not addressed by you.  I think you called after the order was in place.  I think the phone call was February 9[, 2024], so that's not accurate.
>
> "I don't think I heard an explanation to a lot of the things that she suggested happened that would convince this Court that you did not engage in domestic violence over the course of your relationship.
>
> "I think that your approach was and your argument is that there were times when things were good and that she maybe made it seem like things were not as perhaps they were, but that doesn't excuse the fact that there are incidents that have been described that the Court believes did occur where you engaged in acts that would constitute domestic violence under the Code.
>
> "I'm not exactly—I'm not 100 [percent] convinced that you were the one flying the drone, but I believe that you made the phone call.

25.

"I believe that you made what she took as a threat at the park.

"I believe that you did break something. She says it was a sound machine that scared her, trapped her, and cornered her. That you did put your hands on her face, although, when I tried to ask you questions about it, you were a bit evasive in answering what I was asking.

"I believe that the incident where she described that she was in the closet and that you then engaged in conduct thereafter, I believe that did occur. And when I asked you about it, your explanation didn't necessarily convince me otherwise.

"I believe that you did take the child away from her while the child was breastfeeding, and I believe that it occurred in the fashion that she suggested it happened.

"You did go over to the house and enter through the front and go into the garage. And what I heard was that you pressed against her waist to waist, or something like that, and made some sort of comment about her being possibly in danger while she was vacuuming.

"She claimed that she made it clear to you not to come over on [December] 13, [2023], again, unannounced, and on [December] 14[, 2023,] you did. And that you made a threat that if you couldn't live in the house that no one was going to live in the house.

"You took items away from her, including but not limited to the engagement ring, sunglasses, and a purse.

"I believe, [appellant], you were attempting with all of your ability to salvage the relationship that you had with [respondent], or, if not that, figure out a way to go forward separate, but to do what was right for your child. But in doing so, I think you got frustrated, and I think you engaged in domestic violence."

## 2.  Standard of Review

"'We review the grant of a DVPA restraining order for abuse of discretion, and, to the extent we are called upon to review the court's factual findings, we apply the substantial evidence standard of review. [Citation.] In reviewing the evidence, we examine the entire record to determine whether there is any substantial evidence—contradicted or uncontradicted—to support the trial court's findings. [Citation.] We

must accept as true all evidence supporting the trial court's findings, resolving every conflict in favor of the judgment.  [Citation.]  We do not determine credibility or reweigh the evidence.  [Citation.]  If substantial evidence supports the judgment, reversal is not warranted even if facts exist that would support a contrary finding.'"  (*Parris J. v. Christopher U., supra*, 96 Cal.App.5th at p. 116.)

### 3. Analysis

Respondent testified to several incidents where appellant broke her things during arguments, and intimidated and scared her.  During an incident in January 2023, respondent testified she had confronted appellant about a hotel receipt and accused him of cheating.  She was breastfeeding their child, and he got upset and picked up the baby's sound machine and threw it on the floor, smashing it, which caused the baby to start crying; appellant started yelling at her to stop the baby's crying.  Respondent testified she felt scared and trapped.  She also testified he had smashed two clay flowerpots in anger on a different occasion in 2020.

She testified appellant frequently acted out violently or made threats against her, and he would often raise a fist or hand to strike her.  During the same incident as the sound machine, appellant had raised a remote over his head to strike her while she was holding their daughter; he also grabbed respondent's face with his hand and squeezed forcefully.  In June 2023, when she asked him to move out, he made threats to the effect that if he could not live in the house, no one could and he would burn the house down.  He had also stolen personal property from her during an argument in their house, including her engagement ring, sunglasses and a purse—he threatened to sell them, flush them down the toilet, or break them.  He eventually returned the items, except for the engagement ring.

Respondent testified that in August 2023, she had locked herself in their closet during an argument.  When appellant asked to her to come out because he wanted to talk,

27.

she exited the closet and he charged her with his fist raised. She screamed, and he started laughing and taunted her to call 911.

On December 9, 2023, although he was supposed to have moved out of their residence, appellant still had things in the house. On that day, respondent was alone in the house and vacuuming her car in the garage. Uninvited, appellant entered her house through the front door, grabbed respondent from behind in the garage, and told her she should be careful because she could be raped; it terrified her and made her feel unsafe, as though he was going to show up whenever he felt like it. She made it very clear on December 13, 2023, he was to let her know if he was coming over, to which he agreed. However, the next day, he again entered her house uninvited.

On December 15, 2023, respondent testified appellant came to her house and retrieved the rest of his belongings; she was sitting on the couch breastfeeding; appellant yanked the baby away from her suddenly, and the baby started crying. On December 18, 2023, she and appellant met at a park; he told her he was ready to show her what he was capable of, which she took as a threat.

On December 19, 2023, appellant again entered respondent's house uninvited while she was gone. He came to her house a second time later in the day, but he did not enter the house. In February 2024, after she obtained a TRO, he called her cell phone despite the no-contact order. On their daughter's birthday in July 2024, she saw his drone flying over her backyard during a family party.

The trial court credited respondent's testimony about the various incidents she alleged were abusive, although the court did not credit respondent's testimony it was appellant's drone that hovered over her property in July 2024. Appellant argues respondent's testimony is "disputed and uncorroborated" and, thus, it does not constitute substantial evidence supporting the DVRO. It is well established, however, that "the testimony of a single witness, even a party, may alone constitute substantial evidence." (*Chase v. Wizmann* (2021) 71 Cal.App.5th 244, 257; accord, *In re Marriage of Mix*

28.

(1975) 14 Cal.3d 604, 614.) "'[T]he testimony of a witness whom the trier of fact believes, whether contradicted or uncontradicted, is substantial evidence,'" and the appellate court defers to the trial court's determination respondent was the more credible witness. (*Lone Star Security & Video, Inc. v. Bureau of Security & Investigative Services* (2012) 209 Cal.App.4th 445, 458.) The trial court was entitled to credit respondent's testimony, and it constitutes substantial evidence to support the trial court's findings.

Appellant argues even if respondent's testimony is credited, it does not establish abuse as defined by section 6203. According to appellant, at most, respondent described isolated and ambiguous disputes that lacked "corroboration and objective severity." Appellant argues the DVPA requires conduct that intentionally causes or attempts to cause injury, places a person in reasonable fear of imminent serious harm, or otherwise destroys a person's peace in a sustained and substantial manner; appellant maintains the conduct respondent described falls short of this standard.

As noted *ante*, "'abuse'" under the DVPA means, among other things, "(1) To intentionally or recklessly cause or attempt to cause bodily injury[;] [¶] … [¶] (3) To place a person in reasonable apprehension of imminent serious bodily injury to that person or to another[; or] [¶] (4) To engage in any behavior that has been or could be enjoined pursuant to Section 6320." (§ 6203, subd. (a).) Section 6320 includes "attacking, … threatening, … harassing, … destroying personal property, … contacting, … coming within a specified distance of, or disturbing the peace of the other party .…" (*Id.*, subd. (a).) Disturbing the peace of the other party "refers to conduct that, based on the totality of the circumstances, destroys the mental or emotional calm of the other party." (*Id.*, subd. (c).) Respondent described multiple occasions where, among other things, appellant destroyed and stole her personal property; grabbed her face forcefully; made threats against her; and showed up at her house uninvited on multiple occasions. Although appellant characterizes this conduct as "trivial," this repeated conduct— perceived as frightening and terrorizing—is hardly trivial. Having credited respondent's

29.

testimony as to all appellant's alleged conduct other than the drone incident, it amply supports a finding of abuse, including that appellant engaged in conduct that destroyed respondent's emotional or mental calm. (*Id.*, subd. (a).)

Finally, appellant tangentially argues the trial court's finding that appellant did not remain in compliance with the TRO ignored appellant's full compliance in completing the court-ordered batterer's intervention program, and that this finding "tipped the scales in favor of issuing a three-year DVRO." As we understand it, appellant challenges the trial court's finding with respect to appellant's compliance with the TRO. Specifically, appellant appears to argue that while he may not have perfectly complied with the TRO between December 2023 and February 2024, he demonstrated a long history of compliance with the court's orders thereafter, including his full compliance in completing a batterer's intervention program; as such, he contends the single phone call he made in February 2024 is insufficient to support an inability to comply with the court's orders.

During the hearing, appellant made comments that he was in full compliance with the TRO. The court took issue with that statement, noting appellant had *not* fully complied with the TRO given the phone call he made to respondent on February 9, 2024, which appellant had failed to address. This was a direct credibility finding with respect to appellant's assertion he had fully complied with the TRO in all aspects—a finding the trial court was entitled to make based on the evidence.[5] (*Lenk v. Total-Western, Inc.* (2001) 89 Cal.App.4th 959, 968 [appellate court defers to the trier of fact on issues of credibility, even if there is conflicting evidence].)

---

[5] We also note the batterer's intervention program was ordered *at appellant's request* to "hedge his bets" on the resolution of the DVRO in light of pending custody and visitation matters on which the court had not yet issued any long-term orders—it was not ordered or intended as a method to obviate the DVRO petition.

## VIII. No Cumulative Error

"Under the 'cumulative error' doctrine, errors that are individually harmless may nevertheless have a cumulative effect that is prejudicial." (*In re Avena* (1996) 12 Cal.4th 694, 772, fn. 32.) In light of our conclusion that appellant has not demonstrated any individual error, the cumulative error doctrine does not apply. (See *Jiagbogu v. Mercedes-Benz USA* (2004) 118 Cal.App.4th 1235, 1246 ["Since there is no error in these individual rulings, there is, of course, no cumulative error."].)

## DISPOSITION

The judgment is affirmed. In the interests of justice, no costs shall be awarded. (Cal. Rules of Court, rule 8.278(a)(5.)

MEEHAN, J.

WE CONCUR:


HILL, P. J.


HARRELL, J.